IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

ALYSSA NOBRIGA, EVA PEPAJ, JESSICA
HINTON, IRINA VORONINA, MONICA
LEIGH, and URSULA MAYES, as assignees of
MR. HAPPY, INC.,

            Plaintiffs,

      v.

CLEAR BLUE SPECIALTY INSURANCE
COMPANY,

            Defendant.

Case No.: 3:24-cv-01980-SVN

**CLEAR BLUE SPECIALTY INSURANCE COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS**

Defendant, Clear Blue Specialty Insurance Company ("Clear Blue"), for its Memorandum

of Law in Support of its Motion for Judgment on the Pleadings, states as follows:

**I.     INTRODUCTION**

This insurance coverage dispute arises from a strip club's unauthorized use of

"internationally known" celebrity images to promote themed events on social media and in print

advertisements. The insured, Mr. Happy, Inc. ("Mr. Happy"), allegedly misappropriated the

likenesses of six professional models ("Plaintiffs")[1] and used their images, without consent or

compensation, to promote its Waterbury-based venue, Mr. Happy's Café. As discussed below, this

conduct falls squarely outside the coverage afforded by the Commercial General Liability policy

issued by Clear Blue (the "Policy").

---

[1] Jessica Hinton was not a party to the Underlying Lawsuit. However, she is a named Plaintiff in the present declaratory judgment action. Although she did not participate in the Underlying Lawsuit, Plaintiffs' counsel has grouped her with the same set of models who were parties in the Underlying Lawsuit. For consistency and clarity, the defined term "Plaintiffs" refers to Jessica Hinton, collectively, with the other models notwithstanding her non-party status in the prior proceedings.

Although the underlying Complaint does allege a "personal and advertising injury"[2] offense, specifically, a publication that violates a person's right of privacy, the analysis does not end there; it must also consider the Policy's applicable exclusions. Here, the Policy contains a tailored endorsement titled "Exclusion – Libel, Slander, Disparagement, Privacy Violation and Advertising Injury Arising Out of Exhibitions and Related Marketing" (the "ERM Exclusion"), which bars coverage for certain "personal and advertising injury" offenses when they arise out of the use of celebrity images in marketing efforts or the advertising of promotional events, including content disseminated through social media or any other medium. That is precisely what the underlying Complaint alleges.

Importantly, the ERM Exclusion does not render coverage under the Policy illusory. It applies only to a subset of offenses involving defined marketing-related subject matter, such as celebrity images or promotional events, and only when that conduct occurs through specified platforms or channels, including social media. Even within the excluded categories, coverage remains available for conduct that does not involve the particular subject matter or methods identified in the exclusion. The Policy also continues to provide full coverage for unrelated "personal and advertising injury" offenses, including false arrest, malicious prosecution, and wrongful eviction. Accordingly, the ERM Exclusion operates as a narrow and targeted limitation, not a wholesale elimination of coverage.

Under Connecticut law, insurance policies must be interpreted and enforced as written. Where a policy exclusion clearly applies, the insurer has no duty to defend, no duty to indemnify, and no coverage obligation of any kind. That principle controls here. The allegations in the

---

[2] Terms in quotation marks are defined in the Policy.

Underlying Lawsuit (defined below) describe conduct that is clearly excluded by the ERM Exclusion, which is neither ambiguous nor open to competing interpretations.

Because the relevant facts are undisputed and the policy language is clear, there is no potentiality of coverage. Judgment on the pleadings is therefore appropriate, and Clear Blue is entitled to a declaration that it owes no defense or indemnity in connection with the Underlying Lawsuit.

## II.    FACTS ESTABLISHED BY THE PLEADINGS

On June 5, 2019, Plaintiffs filed suit against Mr. Happy in the U.S. District Court for the District of Connecticut, captioned *Alyssa Nobriga, et al. v. Mr. Happy's, Inc. d/b/a Mr. Happy's Café, et al.*, Case No. 3:19-cv-068 (JAM) (the "Underlying Lawsuit"). They filed an Amended Complaint on October 2, 2019. (ECF No. 1 at ¶ 2; Ex. 1, Models' Am. Compl.) In general, Plaintiffs alleged that Mr. Happy misappropriated and altered their images for use in social media and other advertisements promoting events at its strip club to create the false impression that Plaintiffs worked at, endorsed, or were otherwise affiliated with the club. (Ex. 1 at ¶ 24.)

Plaintiffs describe themselves as "well-known models" who earn their livelihood modeling and licensing images to companies, magazines, and individuals for the purpose of advertising products and services. (*Id*. at ¶ 22.) The Complaint provides specific descriptions of each Plaintiff's purported notoriety.[3]

Ms. Gibson asserts that she is an "extremely successful model," that she has a "massive motor sport following," and has been featured in various magazines. (*Id*. at ¶ 31.)

---

[3] Ms. Hinton was not a party to the Underlying Lawsuit, and no allegations in that action pertain to her.

Ms. Pepaj is a successful and "highly-in-demand" runway and fashion model who has appeared in numerous print campaigns and commercials for products including Diet Coke. She has also appeared in several films and on the HBO series *True Detective*. (*Id*. at ¶ 37.)

Ms. Nobriga is a well-known professional model, coach, and media personality whose work has been featured in national publications such as *The Huffington Post*, *Positively Positive*, and the *Daily Love*. (*Id*. at ¶ 28.) She has also appeared as a featured expert on Deepak Chopra's YouTube channel.[4] (*Id*.)

Ms. Voronina is an international model and actress who has represented numerous global brands, including SKYY Vodka, Miller Lite, Michelob Ultra, Bacardi, and Sisley & Detour. (*Id*. at ¶ 49.) She has served as a St. Pauli Girl spokesmodel, was *Playboy* Magazine's Miss January 2001, and was named *Kandy Magazine's* Model of the Year. (*Id.*) Ms. Voronina also maintains a substantial social media presence, with more than 4.5 million followers. (*Id*.) In addition to her modeling career, she tours nationally as a standup comedian and has appeared in several television programs, including *Reno 911!*, *iCarly*, *Svetlana*, and *Saul of the Mole Men*, as well as in various feature films. (*Id*.)

Ms. Leigh achieved notable success as a model for *Playboy*, serving as Playmate of the Month in March 2006, appearing on the magazine's cover in August 2006, and being named *Playboy*'s Cyber Girl of the Year for 2006. (*Id.* at ¶ 52.) She also appeared in several *Playboy* videos and in the reality television series *The Girls Next Door*, which centered on the *Playboy* brand. (*Id.*) Beyond her modeling work, Ms. Leigh has been featured in episodes of *Entourage* and *CSI: Miami* and has held acting roles in multiple films, including an appearance in *Spider-Man 3*.

---

[4] Upon information and belief, Deepak Chopra has approximately 774,000 subscribers on YouTube.

Ms. Mayes is widely recognized for her role as a suitcase model on the hit television game show *Deal or No Deal* and has also made appearances on *Minute to Win It*, *The Tonight Show*, and *The Jay Leno Show*. (*Id.* at ¶ 55.) She has modeled in campaigns for major brands including Volkswagen, Subaru, Bacardi, and Coronet Diamonds, and has been featured in leading fashion publications such as *Vogue*, *Elle*, *InStyle*, *Cosmopolitan*, and *Marie Claire*, among others. (*Id.*)

According to Plaintiffs, none of them were ever employed by Mr. Happy, hired to endorse the club, or otherwise affiliated with it. (*Id.* at ¶¶ 30, 33, 39, 51, 54, 57.) They further alleged that they received no compensation for Mr. Happy's unauthorized use of their images, and that the club's improper and unlawful conduct caused each of them significant monetary and reputational harm. (*Id.* at ¶¶ 26, 30, 33, 36, 39, 51, 57.) Plaintiffs asserted that Mr. Happy used, created, printed, and distributed their images for commercial gain and to falsely suggest to potential customers that each Plaintiff either worked as a stripper at Mr. Happy's Café or endorsed the venue. (*Id.* at ¶¶ 62–63.)

Plaintiffs brought claims under the Lanham Act and Connecticut's Unfair Trade Practices Act and also asserted causes of action for appropriation of likeness, false light, defamation, negligence and respondeat superior, conversion, unjust enrichment, and quantum meruit. (*See* Ex. 1.) They sought compensatory and punitive damages, attorney's fees and costs, and a permanent injunction prohibiting Mr. Happy from using their images for any purpose. (*Id.*)

Clear Blue disclaimed coverage for the Underlying Lawsuit. (ECF No. 1 at ¶ 5.) Plaintiffs, as assignees of Mr. Happy, then filed the present action against Clear Blue seeking a declaration of Clear Blue's obligations under the Policy.

## III.    THE CLEAR BLUE POLICY

Clear Blue issued policy number AE05-00000208-00 to Mr. Happy for the policy period August 9, 2017 to August 9, 2018 (the "Policy"). (Ex. 2, Clear Blue Policy). The Policy affords

coverage, in relevant part, for Commercial General Liability ("CGL"). (*Id.*) The CGL Coverage

Part contains a Limit of Insurance of $1 million for all "personal and advertising injury" sustained

by any one person or organization and $2 million aggregate. (*Id.*)

In relevant part, the Policy provides the following:

**SECTION I – COVERAGES**

*    *    *

**COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.  Insuring Agreement**

    **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. . . .

*    *    *

    **b.**  This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

*    *    *

**SECTION V – DEFINITIONS**

*    *    *

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

    a.  False arrest, detention or imprisonment;
    b.  Malicious prosecution;
    c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
    d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

6

e.  Oral or written publication, in any manner, of material that violates a person's right of privacy;

f.  The use of another's advertising idea in your "advertisement"; or

g.  Infringing upon another's copyright, trade dress or slogan in your "advertisement."

*     *     *

## EXCLUSION LIBEL, SLANDER, DISPARAGEMENT, PRIVACY VIOLATION AND ADVERTISING INJURY ARISING OUT OF EXHIBITIONS AND RELATED MARKETING

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

1.  **Exclusions**

    **A.** The following exclusion is added to paragraph **2. Exclusions of Section I – Coverage – B Personal and Advertising Injury Liability:**

    This insurance does not apply to:

    **Personal and Advertising Injury Parts d, e, f and g Arising Out Of Exhibitions and Related Marketing**

    The following parts of "personal and advertising injury":

    **d.**  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.**  Oral or written publication, in any manner, of material that violates a person's right of privacy;

    **f.**  The use of another's advertising idea in your "advertisement"; or

    **g.**  Infringing upon another's copyright, trade dress or slogan in your "advertisement";

    if such activities arise out of or are part of "exhibitions and related marketing."

*     *     *

2.  **Definitions**

    The following definition is added to **Section V - Definitions:**

7

"Exhibitions and related marketing" means:

**(a)** The creation, production, publication, performance, exhibition, distribution or exploitation of motion pictures, television programs, commercials, web or internet productions, theatrical shows, sporting events, music, promotional events, celebrity image or likeness, literary works and similar productions or work, in any medium including videos, phonographic recordings, tapes, compact discs, DVDs, memory cards, electronic software or media, books, magazines, social media, webcasts and web sites.

**(b)** The conduct of individuals in shows, theatrical productions, concerts, sporting events, or any other form of exhibition.

**(c)** Merchandising, advertising or publicity programs or material for the operations and material described in **(a)** or **(b)** above.

\*      \*      \*

## IV.    LEGAL STANDARDS

### A.    Judgment on the Pleadings Is the Proper Mechanism for Resolving All Issues In This Coverage Dispute

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Motions for judgment on the pleadings are especially appropriate in contract cases, where the case turns on legal interpretations of the obligations of the parties." *Ramos v. AmGuard Ins. Co.*, 747 F. Supp. 3d 389, 393 (D. Conn. 2024). Such motions are particularly appropriate in the insurance coverage setting because questions concerning a liability insurer's duty to defend are answered based upon a review of the underlying pleadings filed against the insured as well as the insurance policy itself. *Cmty. Action for Greater Middlesex Cnty., Inc. v. Am. All. Ins. Co.*, 757 A.2d 1074, 1079 (Conn. 2000) ("The question of whether an insurer has a duty to defend its insured is purely a question of law, which is to be determined by comparing the allegations of [the] complaint with the terms of the insurance policy.").

Here, the relevant facts are undisputed, and the terms of the Policy, including the ERM Exclusion, are unambiguous. As a result, this Court can and should dispose of the coverage

questions presented in Plaintiffs' Declaratory Judgment Complaint by granting judgment on the pleadings.

      **B.**      **Plaintiffs' Amended Complaint and the Clear Blue Policy Are Incorporated By Reference Into Plaintiffs' Declaratory Judgment Complaint**

In evaluating a Rule 12(c) motion, the court may consider not only the pleadings themselves but also documents attached to and incorporated by reference into a complaint. *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint.") (citation modified); *see* Fed. R. Civ. P. 10(c). In this case, the terms of both the underlying Amended Complaint and the Policy are properly before the Court on this Motion because both documents are referenced extensively throughout Plaintiffs' Declaratory Judgment Complaint (ECF No. 1) and Clear Blue's Amended Answer (ECF No. 42). Even if they were not so explicitly referenced, both are integral to the claims in an insurance coverage dispute as the allegations in Plaintiffs' Amended Complaint and the terms of the Policy are the only documents relevant to assessing Clear Blue's putative coverage obligations.

      **C.**      **Clear and Unambiguous Policy Language Must Be Enforced as Written**

It is a core principle of Connecticut contract law that courts must construe insurance policies to effectuate the intent of the parties at the time of contracting. The intent is "derived from the plain and ordinary meaning of the policy's terms." *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 446 (D. Conn. 2010). "If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Galgano v. Metro. Prop. & Cas. Ins. Co.*, 838 A.2d 993, 997 (Conn. 2004) (quoting *Schilberg Integrated Metals Corp. v. Cont'l Cas. Co.*, 819 A.2d 773, 789 (Conn. 2003)).

Though ambiguities in an insurance policy are construed against the insurer, such a rule applies only where "the policy terms are indeed ambiguous." *Conn. Med. Ins. Co. v. Kulikowski*, 942 A.2d 334, 338 (Conn. 2008). "Indeed, courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." *Galgano*, 838 A.2d at 997 (quoting *Schilberg*, 819 A.2d at 789). To that end, "in determining whether the terms of an insurance policy are clear and unambiguous, a court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Kulikowski*, 942 A.2d at 338 (citation modified).

"[A] provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading." *Id.* "Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Id.*

Here, the ERM Exclusion is not ambiguous. It is specific, conspicuous, and directly applicable to the allegations in the Underlying Lawsuit. As such, the Court must give it full effect.

### D. The Duty to Defend Arises Only When the Alleged Conduct Is Potentially Covered

Under Connecticut law, "[t]he question of whether an insurer has a duty to defend its insured is purely a question of law, which is to be determined by comparing the allegations of [the] complaint with the terms of the insurance policy." *Cmty. Action for Greater Middlesex Cnty., Inc. v. Am. All. Ins. Co.*, 757 A.2d 1074, 1079 (Conn. 2000). "The allegations of the underlying complaint are determinative of an insurer's duty to defend the insured." *Farm Fam. Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 89 (D. Conn. 2017) (citation modified). In other words, the duty to defend arises when a complaint states a cause of action which appears on its face to be within the policy's scope of coverage. *Vermont Mut. Ins. Co. v. Ciccone*, 900 F. Supp. 2d 249, 267 (D. Conn. 2012). There are, however, limits to the analysis and courts "will not predicate the duty to

10

defend on a reading of the complaint that is conceivable but tortured and unreasonable." *Misiti, LLC v. Travelers Prop. Cas. Co. of Am.*, 61 A.3d 485, 491 (Conn. 2013) (citation modified).

Notably, the duty to defend "does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage." *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 826 A.2d 107, 122 (Conn. 2003). Thus, if the complaint alleges facts that the policy does not cover, there is no duty to defend. *Id*.

As discussed below, the allegations in the Underlying Lawsuit, taken as true, describe conduct that falls entirely within the scope of the ERM Exclusion. That exclusion is dispositive. Because the Policy expressly excludes coverage for the alleged injury, Clear Blue has no duty to defend or indemnify Mr. Happy in the Underlying Lawsuit as a matter of law.

## V.     ARGUMENT

### A.     The ERM Exclusion Unambiguously Bars Coverage for the Underlying Lawsuit

Clear Blue does not dispute that the conduct alleged in the Underlying Lawsuit, namely, the publication of Plaintiffs' images on social media in a manner that allegedly violated their rights of privacy, implicates the offense set forth in subpart (e) of the Policy's definition of "personal and advertising injury." However, that is only the threshold inquiry. Even where an offense falls within the initial grant of coverage, there is no duty to defend if a policy exclusion clearly and unambiguously applies. Here, the ERM Exclusion eliminates coverage for any such offense when it arises out of or is part of "exhibitions and related marketing," a defined phrase that wholly encompasses the conduct alleged in the Underlying Lawsuit.[5]

---

[5] As relevant here, "exhibitions and related marketing" encompasses the "publication . . . distribution or exploitation of . . . celebrity image or likeness . . . in any medium including . . . social media."

"It is generally understood that for liability for an accident or an injury to be said to 'arise out of' an occurrence or offense, it is sufficient to show only that the accident or injury 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' that occurrence or offense, in order to meet the requirement that there be a causal relationship between the accident or injury and that occurrence or offense." *QSP, Inc. v. Aetna Cas. & Sur. Co.*, 773 A.2d 906, 926 (Conn. 2001) (citation modified). The phrase "is usually interpreted as indicating a causal connection." *Id.* (citation modified); *Farm Fam. Cas. Ins. Co. v. Samperi*, 242 F. Supp. 3d 83, 89 (D. Conn. 2017) ("An insurance company does not have the duty to defend against allegations that 'grow out of' claims that are excluded under the policy."). Under this standard, the ERM Exclusion applies so long as the alleged injury has a causal connection or relationship with an excluded "exhibition and related marketing" activity regardless of the specific legal theory asserted.

The term "exhibitions and related marketing" is expressly defined in the Policy, and that definition controls, irrespective of how the words "exhibitions" or "marketing" might be interpreted in everyday usage. *Warzecha v. USAA Cas. Ins. Co.*, 259 A.3d 1251, 1255 (Conn. Ct. App. 2021) (noting that where a term is defined in the policy, the court is "bound by that plain language and cannot read the policy differently").

Part (a) of that definition consists of three distinct elements:

1. The activity or means: including publication, distribution, and exploitation;

2. The subject matter: including promotional events and celebrity image or likeness; and

3. The medium: including social media.

Plaintiffs' allegations that Mr. Happy published, distributed, and/or exploited their images and likenesses on Facebook, among other places, satisfy all three components. To be sure,

12

Plaintiffs' contentions underscore that their claims rise and fall on their celebrity status. They do not present themselves as private individuals whose images were wrongfully used in a manner that invaded their personal dignity. Rather, they portray themselves as internationally recognized models and entertainers who, by their own account, have monetized their identities through commercial endorsements, national brand campaigns, appearances in television and film, and the cultivation of millions of followers across social media platforms. In doing so, Plaintiffs concede that the value of their likenesses is tied directly to their public status and perceived marketability, not to any private interest.

The factual allegations leave no doubt on this point. Ms. Gibson touts her "massive" following and work for various magazines. Ms. Pepaj highlights her work on highly acclaimed HBO television series and national ad campaigns. Ms. Nobriga identifies the numerous publications in which her work has been featured as well as her affiliation with Deepak Chopra. Ms. Voronina has more than 4.5 million social media followers, is a touring comedian, and has been featured in numerous network television series. Ms. Leigh describes an extensive print, online, and television career with *Playboy* as well as appearances in television series and movies. Aside from boasting numerous magazine and brand campaigns, Ms. Mayes was a well-known model for *Deal or No Deal* who also appeared in many other television programs.

By advancing these allegations, Plaintiffs themselves distinguish their claims from those of private individuals. They ground their asserted damages not in any loss of private dignity but in the supposed diminution of their marketable celebrity identities. This distinction is critical. It highlights that the gravamen of the Complaint rests on Plaintiffs' contention that they are commercially valuable public figures whose identities carry inherent worth in the marketplace. The very theory of misappropriation depends on the notion that Mr. Happy allegedly sought to

13

capitalize on the celebrity status Plaintiffs say they command.

Thus, Plaintiffs cannot plausibly claim that they are both celebrities enjoying international recognition and at the same time ordinary individuals entitled to reputational or dignitary damages untethered to commercial value. Their case rises or falls on their asserted celebrity status, and the Court must evaluate the sufficiency of their allegations with that backdrop firmly in mind.

Even if one were to disregard part (a) of the definition of "exhibitions and related marketing," there is a separate and independent basis for applying the exclusion to Plaintiffs' claims. Part (c) of the definition provides that "exhibitions and related marketing" also includes "merchandising, advertising or publicity programs or material for the operations and material described" in part (a). In other words, where the insured advertises subject matter falling within part (a), as it did here, coverage is also excluded under part (c).

Here, Nobriga, Pepaj, Voronina, and Leigh allege that Mr. Happy used their images to advertise themed strip club events on social media, including Cinco de Mayo (Ex. 1 at Ex. A and J.), St. Patrick's Day (Ex. 1 at Ex. D), Halloween (Ex. 1 at Ex. E and I).[6]

These were not ordinary strip club evenings. Each advertisement, whether tied to a holiday or to a recurring weekly promotion, sought to differentiate the event through offers of free admission, drink specials, buffets, prizes, and other incentives—all marketed using the Plaintiffs' likenesses. Because those advertisements plainly constitute "advertising" and/or "publicity programs or material" for "promotional events" (not to mention involving the exploitation of

---

[6] The exhibits attached to the Underlying Lawsuit do not make clear where the images of Voronina (Ex. 1, Ex. I), Leigh (Ex. 1, Ex. J), and Mayes (Ex. 1, Ex. K) were published, or whether they appeared on social media. Regardless, the definition of "exhibitions and related marketing" encompasses materials published "in any medium," and the ERM Exclusion therefore applies irrespective of the platform or location where the images were posted.

"celebrity image or likeness") on social media and other mediums, they fall squarely within the scope of part (c) of the ERM Exclusion.

Accordingly, the ERM Exclusion unambiguously applies and precludes any possibility of coverage for the claims asserted in the Underlying Lawsuit.

**B.      The ERM Exclusion Does Not Render Coverage Illusory**

The ERM Exclusion has been the subject of litigation in both the U.S. Court of Appeals for the Fifth Circuit (applying Texas law) and the U.S. District Court for the District of Rhode Island (applying Rhode Island law). *See Princeton Excess & Surplus Lines Ins. Co. v. A.H.D. Houston, Inc.*, 84 F.4th 274 (5th Cir. 2023); *Princeton Excess & Surplus Lines Ins. Co. v. R.I. Cranston Ent. Inc.*, 725 F. Supp. 3d 184 (D.R.I. 2024). In both cases, the courts proceeded from the unchallenged premise that the ERM Exclusion applied by its terms and was not ambiguous. The only question was whether the exclusion rendered the coverage grant under Coverage B illusory. The Fifth Circuit answered that question definitively: it does not. *A.H.D. Houston*, 84 F.4th at 286.

Under Connecticut law, an exclusion is illusory only if it "eliminates coverage altogether." *Karas v. Liberty Ins. Corp.*, 228 A.3d 1012, 1038 (Conn. 2019). So long as the coverage grant remains broader than the exclusion, coverage is not illusory. *Conn. Ins. Guar. Ass'n v. Drown*, 37 A.3d 820, 829 (Conn. App. Ct. 2012), *aff'd*, 101 A.3d 200 (Conn. 2014). While the ERM Exclusion eliminates coverage for four of the seven offenses included in the definition of "personal and advertising injury" (subparts (d) through (g)), it applies only when those offenses arise out of "exhibitions and related marketing." The remaining offenses (subparts (a) through (c)) are entirely unaffected. And even for subparts (d) through (g), the exclusion applies only when the conduct involves particular types of content and specific kinds of media.

15

In *A.H.D. Houston*, the Fifth Circuit reversed the district court's holding that the ERM Exclusion effectively nullified all "advertising injury" coverage. The district court had improperly treated "personal injury" and "advertising injury" as wholly distinct coverage silos and reasoned that the exclusion eliminated all protection for the latter. 621 F. Supp. 3d 746, 756–57 (S.D. Tex. 2022). The Fifth Circuit rejected that logic, explaining that "[t]o slice and dice the policy language . . . in nullifying the exclusion is contrary to the policy's text and structure." *A.H.D. Houston*, 84 F.4th at 286.

By contrast, the *R.I. Cranston* court adopted the very reasoning the Fifth Circuit rejected. It improperly divided Coverage B into separate categories of "personal injury" and "advertising injury," concluding that the ERM Exclusion operated to eliminate the latter entirely. But that segmented approach has no basis in the policy language and is inconsistent with Connecticut's directive to interpret insurance contracts as a whole. *Hansen v. Ohio Cas. Ins. Co.*, 687 A.2d 1262, 1266 (Conn. 1996) (courts must "look at the [policy] as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result.").

Compounding its analytical error, the *R.I. Cranston* court also appears to have conflated the ERM Exclusion with a separate provision in the same endorsement, titled "Infringement of Copyright, Patent, Trademark or Trade Secret" (the "IP Exclusion"). That distinct exclusion bars coverage for intellectual property claims unless they arise out of "exhibitions and related marketing." *See R.I. Cranston*, 725 F. Supp. 3d at 195–96. The court mistakenly applied examples meant to show that the ERM Exclusion was not illusory as if they pertained to the IP Exclusion.

16

This confusion, likely exacerbated by a lack of clarity in the insurer's briefing, undermined the reliability of the court's analysis.[7]

What *R.I. Cranston* failed to recognize is that the ERM Exclusion applies only in narrow, defined circumstances. Even within subparts (d) through (g), coverage is excluded only if the conduct meets the definition of "exhibitions and related marketing," which contains three discrete elements: (1) the activity or means; (2) the subject matter; and (3) the medium. All three elements must be satisfied for the exclusion to apply.

While many examples may involve a qualifying medium (*e.g.*, social media) and means (*e.g.*, publication or distribution), they often lack the narrowly defined subject matter, such as promotional events, celebrity images, or similar entertainment-related content. Without that, the exclusion does not apply.

The following are concrete examples of conduct that may trigger offenses (d) through (g) under the Policy but would not meet the definition of "exhibitions and related marketing":

**Offense (d): Oral or written publication that slanders, libels, or disparages**

- A club manager sends a defamatory email to another business accusing a former employee of theft as part of a job reference.

- A mass companywide email falsely includes allegations that an employee is abusing drugs.

- The owner falsely tells vendors that a rival nightclub has filed for bankruptcy.

**Offense (e): Oral or written publication violating a person's right of privacy**

- A bartender circulates a group text containing a patron's credit card receipt with identifying information.

- Security footage of staff members using a restroom is inadvertently shared with other staff, violating their privacy.

---

[7] For the avoidance of doubt, Clear Blue is not relying upon the IP Exclusion.

**Offense (f):** **Use of another's advertising idea in your "advertisement"**

- A club's roadside billboard mimics the color scheme and slogan of a competitor's marketing campaign.

- A nightclub appropriates a drink promotion tagline from a rival and prints it on menus and napkins.

**Offense (g):** **Infringing upon another's copyright, trade dress, or slogan in your "advertisement"**

- A chalkboard sign outside the club uses a protected slogan from another bar.

- A direct-mail flyer includes a licensed cartoon or image without proper permissions.

- An ad placed in the phonebook copies the layout and text of a competitor's copyrighted format.[8]

As the Fifth Circuit correctly held, the ERM Exclusion "removes much, but by no means all" of Coverage B. *A.H.D. Houston*, 84 F.4th at 286. These examples demonstrate that the exclusion operates as a targeted limitation, not a blanket elimination of coverage. It clearly delineates the outer bounds of liability for which Clear Blue agreed to provide coverage,

---

[8] The examples given by the insurer in its briefing in *R.I. Cranston* include:

(1) a claim that the club defamed a competitor in an advertisement by stating that customers of the club do not get food poisoning, unlike customers of the competitor;

(2) a claim that the club violated a customer's privacy rights by using a photograph of the customer sitting at the bar or standing in front of the building on a billboard without the customer's consent;

(3) a claim that the club used the slogan or advertising idea "where's the beef" in an advertisement for its buffet;

(4) a claim that the club negligently disseminated customers' names, social security numbers and credit card information; or

(5) a claim that a bartender defamed a competitor by telling customers that the competitor watered down its liquor.

*See* PESLIC Brief, U.S.D.C. R.I. Case No. 1:21-cv-00063, ECF No. 61 at 18. Clear Blue agrees that each of these examples would satisfy one of the offenses in parts (d)–(g) of the "personal and advertising injury" definition but would not be excluded from coverage by the ERM Exclusion.

specifically excluding risks arising from the commercial exploitation of celebrity images in social media marketing, while leaving other risks intact.

Even accepting, for argument's sake, the flawed view adopted in *R.I. Cranston*, that "personal and advertising injury" can be artificially broken into "personal injury" (offenses (a)–(c)) and "advertising injury" (offenses (d)–(g)), the exclusion still cannot be deemed illusory unless it eliminates coverage for *all* of the offenses in the latter group. That is simply not the case here. As the above examples show, there are numerous scenarios in which subparts (d) through (g) would remain fully covered under the Policy.

Accordingly, the ERM Exclusion does not render coverage illusory under Connecticut law or any reasonable interpretation of the Policy.

### C.      Absent a Duty to Defend, There is No Duty to Indemnify

It is well-settled under Connecticut law that "[i]f an insurer has no duty to defend, it has no duty to indemnify." *Kingstone Ins. Co. v. Bottone*, 719 F. Supp. 3d 192, 198 (D. Conn. 2024); *DaCruz v. State Farm Fire & Cas. Co.*, 846 A.2d 849, 858 (Conn. 2004) ("[W]here there is no duty to defend, there is no duty to indemnify") (quoting *QSP, Inc. v. Aetna Casualty & Surety Co.*, 773 A.2d 906 (Conn. 2001)).

Because the ERM Exclusion unambiguously eliminates any potential for coverage under the Clear Blue Policy, there is no duty to defend, and therefore no duty to indemnify, as a matter of law.

### VI.    CONCLUSION

For the foregoing reasons, Clear Blue respectfully requests that this Court grant its Motion and enter judgment on the pleadings in its favor and against the Plaintiffs, declaring that Clear Blue had no duty to defend Mr. Happy in the Underlying Lawsuit and has no duty to indemnify Plaintiffs for any amounts arising from the settlement and assignment entered into with Mr. Happy

19

to resolve that lawsuit. Clear Blue further requests the entry of Final Judgment and such other

relief as the Court deems just and appropriate.


Dated:  October 30, 2025                    Respectfully submitted,


                                            /s/ Jordon S. Steinway
                                            Jordon S. Steinway, phv208278
                                            Craig M. Leff, phv208946
                                            Katherine A. Martin, phv208732
                                            BATESCAREY LLP
                                            191 North Wacker, Suite 2400
                                            Chicago, IL 60606
                                            Phone:  (312) 762-3169
                                            Email:  jsteinway@batescarey.com
                                            Email: cleff@batescarey.com
                                            Email:  kmartin@batescarey.com

                                            Michael J. Dugan, ct 18669
                                            LITCHFIELD CAVO LLP
                                            82 Hopmeadow Street, Suite 210
                                            Simsbury, CT 06089
                                            Phone:  (860) 413-2704
                                            Email:  dugan@litchfieldcavo.com

                                            *Counsel for Clear Blue Specialty Insurance
                                            Company*

24520.8720041

20

## CERTIFICATE OF SERVICE

I hereby certify that, on October 30, 2025, I electronically filed the foregoing document and all exhibits referenced therein with the Clerk of the Court using the CM/ECF System, which will send a notification of such filing to all counsel of record.

/s/ Jordon S. Steinway